J-S07026-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANGEL JULIANNA GARNER | : | |
| | : | |
| Appellant | : | No. 1217 MDA 2025 |

Appeal from the Judgment of Sentence Entered July 31, 2025
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0000568-2023

BEFORE:  BOWES, J., OLSON, J., and BENDER, P.J.E.

MEMORANDUM BY OLSON, J.:                **FILED: MAY 11, 2026**

Appellant, Angel Julianna Garner, appeals from the judgment of sentence entered on July 31, 2025.  We affirm.

In 2022, Appellant lived at a residence along West Jackson Street in York, Pennsylvania, with her paramour, Vernon Daniels, their infant daughter, and Mr. Daniels' mother, Carol Markle.  In November 2022, however, Appellant and Mr. Daniels separated, and Appellant began the process of moving out of the residence.  At this time, Mr. Daniels reconnected with Carmen Laura Marte-Polanco (the "Victim"), an earlier romantic partner.

In December 2022, Mr. Daniels and his mother, Ms. Markle, both worked for the same employer, Graham Packaging.  On December 6, 2022, Ms. Markle worked from 7:00 p.m. to 7:00 a.m., while Mr. Daniels was set to work from 7:00 a.m. to 7:00 p.m.  Mr. Daniels needed assistance with childcare on December 6th since he worked during the day, and because he and Appellant

were in the process of separating. Accordingly, that day, the Victim drove Mr. Daniels, with the child, to work, dropped Mr. Daniels off, and then picked Ms. Markle up after her shift finished. Ultimately, the Victim, Ms. Markle, and the child arrived at the residence along West Jackson Street at approximately 7:30 a.m. The Victim brought the child into the residence while Ms. Markle followed. Unbeknownst to the Victim and Ms. Markle, however, Appellant was in the basement of the West Jackson Street residence when the Victim arrived. A confrontation between the Victim and Appellant subsequently ensued.

The details of the altercation were disputed at trial.[1] The Victim testified that she walked into the living room at the residence and, while she was attempting to set the child down, she heard Appellant come up behind her. The Victim further testified that, at that point, Appellant "grabbed [her] by [the] hair and started hitting [her] from the back." N.T. Trial, 4/29/25, at 89. Then, the Victim testified that Appellant attempted to "drag [her] out of the house," which caused her to fall. *Id.* At that time, Appellant got "on top of [the Victim] and punched [her] one more time." *Id.* After the Victim was able to get up, the two "said things to each other" and the Victim "asked for [her cellular tele]phone because [it] was around where [Appellant] was standing." *Id.* at 90. Appellant handed the Victim's cellular telephone to her, and then the Victim got into her car and "sped off." *Id.*

---

[1] Appellant was subsequently charged with simple assault and harassment. *See* 18 Pa.C.S.A. §§ 2701(a)(1) and 2709(a)(1).

Ms. Markle also testified at trial about the altercation. In particular, Ms. Markle explained that the Victim took the child into the residence and, "when she was going out the door," Appellant "jumped [on] her." *Id.* at 107. Ms. Markle further testified that Appellant "started hitting [the Victim] as [the Victim] was going out the door" and, at that time, Ms. Markle was "[s]creaming and hollering[,] telling them to stop." *Id.* at 108. Ms. Markle testified that the altercation ended shortly thereafter when the Victim "was able to get to her car" and leave the residence. *Id.*

Appellant's version of the altercation differed. According to Appellant, on the morning of December 6, 2022, Appellant, who no longer resided at the West Jackson Street residence, went there to collect her work clothes because she knew Mr. Daniels "would not be there." *Id.* at 140. When Appellant was "on [her] way up the steps," she saw the Victim and Ms. Markle "at the door." *Id.* Appellant then confronted the Victim and "asked [the Victim] if she could leave." *Id.* at 141. At that point, Appellant testified that Ms. Markle screamed at Appellant and told the Victim to shoot Appellant. *Id.* This, per Appellant, made her afraid because, prior to the confrontation, Appellant became aware of a textual message ("text message") between Ms. Markle and Mr. Daniels wherein Ms. Markle stated the following:

> I told [the Victim] already [that Appellant is] a sneaky ass and
> I told [the Victim] if she has to shoot [Appellant] then so be it
> she needs a good lesson ima [sic] get a gun in next two days.

Defendant's Exhibit 1. Appellant testified that she pushed the Victim out of the residence and punched the Victim because of her awareness of the foregoing text message, as well as the fact that, during the confrontation with the Victim, Ms. Markle was directing the Victim to shoot Appellant, and the Victim was reaching into her pocket. *Id.* at 143.

On April 28, 2025, the case proceeded to a jury trial, during which Appellant requested a self-defense jury instruction. *Id.* at 165. The trial court ultimately denied Appellant's request. Appellant was subsequently convicted of the aforementioned charges. On June 25, 2025, the trial court sentenced Appellant to serve one year of probation and ordered her to pay a $25.00 fine. On July 31, 2025, a restitution hearing was held, at which time the court ordered restitution in the amount of $491.19 to the Victim. *Id.* This appeal followed.

Appellant raises the following issue for our review:

> Did the trial court err in refusing to instruct the jury on self-defense?

Appellant's Brief at 4.

On appeal, Appellant argues that the trial court erred in failing to issue a jury instruction on self-defense. Appellant contends that, through her own testimony, she established evidence of her reasonable belief that the use of force was immediately necessary to protect herself and, therefore, the trial court was required to charge the jury on self-defense so that it could properly

evaluate the evidence and determine the credibility and validity of the justification defense.  We disagree.

When reviewing a challenge based upon a trial court's refusal to issue a specific instruction,

> it is the function of this Court to determine whether the record supports the trial court's decision.  In examining the propriety of the instructions a trial court presents to a jury, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case.  A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue.  A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions.  The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal.

*Commonwealth v. Sandusky*, 77 A.3d 663, 667 (Pa. Super. 2013) (cleaned up).

Section 505 of Crimes Code provides the following concerning use of force in self-protection:

> **(a) Use of force justifiable for protection of the person.**— The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.
>
> **(b) Limitations on justifying necessity for use of force**.—
>
> ***

(2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:

(i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

(ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

18 Pa.C.S.A. § 505 (a)-(b).

To successfully claim self-defense and, further, to warrant a jury instruction on this basis, a defendant must demonstrate the following: "(1) the defendant reasonably believed that [s]he was in imminent danger of death or serious bodily injury and that it was necessary to use force to prevent such harm; (2) the defendant did not provoke the incident which resulted in the use of force; and (3) the defendant did not violate a duty to retreat." *Commonwealth v. Green*, 273 A.3d 1080, 1084-1085 (Pa. Super. 2022) (citation omitted).[2]  Importantly, though,

_____

[2] The elements supporting a self-defense instruction are the same regardless of whether a defendant is fending off a threat of death or serious bodily injury or a less lethal attack.  *See Commonwealth v. Smith*, 97 A.3d 782, 787 (Pa. Super. 2014) (discussing the three elements for a claim of self-defense even though the appellant was convicted of aggravated assault, recklessly endangering another person and possession of an instrument of a crime); *see also Commonwealth v. Wingert*, 341 A.3d 88 (Pa. Super. 2025)

*(Footnote Continued Next Page)*

>[b]efore the issue of self-defense may be submitted to a jury for consideration, a valid claim of self-defense must be made out as a matter of law, and this determination must be made by the trial judge. Such claim may consist of evidence from whatever source. Such evidence may be adduced by the defendant as part of [her] case, or conceivably, may be found in the Commonwealth's own case in chief or be elicited through cross-examination. However, such evidence from whatever source must speak to [the aforementioned] three specific elements for a claim of self-defense to be placed in issue for a jury's consideration.

***Commonwealth v. Hansley***, 24 A.3d 410, 420–421 (Pa. Super. 2011) (quotation and emphasis omitted).

Herein, the trial court determined that Appellant failed to establish two of the three necessary elements to establish a claim of self-defense. First, it concluded that the "record . . . contain[ed] no testimony or evidence that the [Victim] engaged in any threatening, aggressive, or unlawful conduct toward [Appellant]." Trial Court Opinion, 10/8/25, at 3. Instead, the "testimony established that the [Victim] merely delivered the child, did not speak to [Appellant], made no threats, and undertook no physical act of aggression." *Id.* While Appellant argued that the prior text messages between Ms. Markle and Mr. Daniels gave credence to Appellant's claim of subjective fear, the trial court rejected this claim. Instead, it concluded that, "absent an act or threat by the alleged victim," the use of force was not justified. *Id.* Second, it noted that Appellant, herself, admitted that she was the initial aggressor. *Id.* Based

---

(non-precedential decision); ***Commonwealth v. Millett***, 303 A.3d 742 (Pa. Super. 2023) (non-precedential decision).

upon the foregoing, the trial court concluded that Appellant "failed to establish the threshold basis necessary to warrant a self-defense charge." ***Id.*** at 4.

We discern no abuse of discretion on the part of the trial court. The uncontradicted testimony established that Appellant provoked the incident with the Victim. The Victim clearly testified that Appellant started the confrontation by grabbing her hair, hitting her in the back, pushing her out the door and punching her. ***See*** N.T. Trial, 4/29/25, at 88-89. Importantly, Appellant did not dispute this. The relevant portion of Appellant's testimony is as follows.

> **[Commonwealth]:** … Now, you said that when [the Victim] was . . . or when [Ms. Markle] was saying that to you in the house or saying whatever, [the Victim] was walking towards the door, correct?
>
> **[Appellant]:** No.
>
> **[Commonwealth]:** Okay. Was she facing you?
>
> **[Appellant]:** Yes.
>
> **[Commonwealth]:** And at that point, you grabbed her by the hair?
>
> **[Appellant]:** No. I'm trying to push her out, and she's trying to force in after. She wants to go for her bag. She went to go right in her pocket to grab her gun.
>
> **[Commonwealth]:** To grab what?
>
> **[Appellant]:** Her gun.
>
> **[Commonwealth]:** Did you see her with a gun?
>
> **[Appellant]:** No. **I pushed her before anything**.
>
> **[Commonwealth]:** So you don't know if she had a gun?

**[Appellant]:** I'm scared because of the threats that they're making.

**[Commonwealth]:** Threats who's making?

**[Appellant]:** [Ms. Markle].

**[Commonwealth]:** So not [the Victim]?

**[Appellant]:** No.

**[Commonwealth]:** So [the Victim] never threatened you? She never touched you?

**[Appellant]:** She went to go grab it in her – she went to go get in her –

**[Commonwealth]:** Did she touch you?

**[Appellant]:** No.

**[Commonwealth]:** Did she throw a punch at you?

**[Appellant]:** Yes, she did.

**[Commonwealth]: After you started hitting her, correct?**

**[Appellant]: After I pushed her out the house.**

*Id.* at 146-147 (emphasis added). This testimony, standing alone, was sufficient to defeat Appellant's request for a jury instruction on the issue of self-defense. We therefore conclude that the trial court did not abuse its discretion in refusing a jury instruction on justification of the use of force in self-defense.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/11/2026